UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


UNITED SATES OF AMERICA      *   Case No. 11-MJ-00456(JMA)
                             *
     v.                      *   Brooklyn, New York
                             *   May 26, 2011
MONIKA KAPOOR,               *
                             *
          Defendant.         *
                             *
* * * * * * * * * * * * * *   *


TRANSCRIPT OF CRIMINAL CAUSE FOR BOND HEARING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:      NATHAN D. REILLY, ESQ.
                         Asst. United States Attorney
                         United States Attorney's Office
                         271 Cadman Plaza East
                         Brooklyn, NY  11201

For the Defendant:       MILDRED M. WHALEN, ESQ.
                         Federal Defenders of New York, Inc.
                         16 Court Street
                         Brooklyn, NY  11201


Also Present:            MR. RYAN LEHR
                         U.S. Pretrial Services Officer




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 3:42 p.m.)

2          THE CLERK:  Criminal cause for bond hearing, *United*

3    *States v. Monica Kapoor*, Case No. 11-mj-456.  Please state

4    your appearances for the record.

5          MR. REILLY:  Good afternoon, Your Honor.  Nathan

6    Reilly for the United States.

7          THE COURT:  Good afternoon.

8          MS. WHALEN:  Good afternoon, Your Honor, the

9    Federal Defender of New York by Mildred Whalen for Ms. Kapoor

10   and I'm joined by Amy Gell, who is Ms. Kapoor's attorney in

11   her immigration proceedings.

12         THE COURT:  And we also have?

13         MR. LEHR:  Good afternoon, Your Honor, Ryan Lehr

14   on behalf of Pretrial Services.

15         THE COURT:  So who'd like to go first?

16         MS. WHALEN:  Your Honor, I guess I'll go first and

17   my initial argument would be to respond to some of the issues

18   that were raised in the government's papers.

19         I guess I'd open with just sort of saying that what

20   our briefs demonstrate is that special circumstances is

21   clearly a case-by-case evaluation and the bases for special

22   circumstances aren't consistent within the cases themselves.

23   I mean cases are cited for one proposition where bail is

24   actually granted and yet, you know, cited as a negative

25   because they found that a certain circumstance didn't apply.

3

1          So I guess my first response would be that with

2     respect to the high probability of success on the merits, I

3     think the position that the government's staking out would,

4     in effect, not make bail available until after the

5     extradition proceeding had taken place.

6          I understand that a number of the cases that

7     they've cited have shown that at least with probable cause

8     you need to develop the facts in more detail, but I think in

9     Ms. Kapoor's case, the issues that we've raised with respect

10    to probable cause, the issue that we've raised with respect

11    to the confession being obtained by torture, the fact that

12    the confession is really the key link in the case to show any

13    kind of relationship between Ms. Kapoor and what happened

14    here -- I think setting forth in my letter the extradition

15    papers show that she signed certain documents, but the

16    extradition papers also show that many of those documents

17    were altered after she had signed it.

18         Her brothers who clearly have been identified, one

19    of them at least, Rajeev (ph), as the mastermind in the case,

20    the individual who was trying to hide documents, he and his

21    brother have basically said that she wasn't involved in any

22    of the wrongdoing and the only connection that I think the

23    Indian government has set forward to show probable cause is

24    in her statement where she said she signed some documents and

25    was paid to do so and I think that she has renounced that

4

1    statement in her application for asylum as being obtained

2    after torture and my argument to the Court is if you remove

3    that statement, I don't think that probable cause has been

4    set forth at all.

5           I agree with the government that this hasn't been

6    as deeply established as it will be at a hearing.  In my

7    papers it may not be our only basis for attack, but to me

8    after my initial review of the papers, it was the most

9    obvious area for attack.

10          I think the second argument relating to special

11   circumstances is her asylum claim and while the government is

12   correct she didn't immediately request asylum, and I think

13   Ms. Gell can probably speak more fully to that, my experience

14   with the clients that have claimed asylum has been that they

15   haven't made an asylum claim if they've been admitted into

16   the United States.

17          Many people come into the United States, overstay

18   their visas.  When they are then apprehended, they'll make a

19   claim of asylum, but most of them are just thankful to be

20   able to be let in.

21          The individuals that I've seen in my experience

22   making applications for asylum -- and this is through the

23   numerous immigration files I've read with respect to clients

24   who have immigration problems in federal court.  The files

25   that I've read are people generally raise the asylum claim at

5

1    the airport when they're denied entry.  And then they make

2    the application for asylum then and there.

3            But it hasn't been my experience that people make

4    it if they actually are admitted into the United States.

5            So I don't know that that is such a strong fact

6    against my client, the delay in making the asylum claim.

7            The one thing that I will note is that there's been

8    significant delay on the part of the Indian government in

9    this case.

10           An item that I didn't attach to my motion but

11   that's present in the affidavit -- and I'm sorry, the

12   extradition papers aren't Bates stamped.

13           THE COURT:  Yes, so am I.

14           MS. WHALEN:  I've actually -- I've made a copy.

15   Our copier can stamp them with pages and I'm happy to send

16   everybody a copy so that we can use it for the extradition

17   hearing itself.

18           But there's a 2002 affidavit from the

19   superintendent of police and in there on page 2 -- and I can

20   show the government --

21           MR. REILLY:  Yes.

22           THE COURT:  -- and hand it up to the Court.  They

23   say that they -- or not page 2 of that report, I'm sorry.  On

24   page 10 they actually indicate that they know in 2002 that my

25   client is in the United States staying with her father and

1    her brother, Rajeev Khanna (ph) and they give the address

2    4122 --

3               THE COURT:  Right.

4               MR. REILLY:  -- 53rd Street, Woodside Queens.

5               THE COURT:  Right, I saw that.

6               MS. WHALEN:  So they had information as of 2002

7    where she was.  As we noted, a warrant for her arrest was

8    issued in 2003 and no action was taken until a second warrant

9    was issued in April of 2010 after she was released on bail

10    for these asylum proceedings and that's when the Indian

11    government chose to go forward with extradition.

12               So I think that while there was delay in her part

13    in raising asylum issues, there's been a significant delay on

14    the part of the Indian government that as of yet is

15    unexplained as to why they didn't bring extradition

16    proceedings against my client when they had reason to believe

17    that they knew where she lived and I believe that there are

18    other documents where that's listed as her prior residence in

19    the United States.  I believe it's actually in her asylum

20    papers that she lists that --

21               THE COURT:  Is that the only document -- you know,

22    I haven't had a chance to look as carefully as I'd like to

23    and this is a pretty thick file, but that's the page that

24    chambers has come up with that showed -- isn't that the one?

25               THE CLERK:  A different page.

7

1          THE COURT:  Oh that was a different page?

2          THE CLERK:  Yes.

3          THE COURT:  Okay.

4          MS. WHALEN:  I was reviewing my papers before

5     court.  I believe there were two instances.  I know that it

6     was definitely mentioned in one of the earlier --

7          THE COURT:  Can't find the Post-It?

8          MS. WHALEN:  -- summary findings where they

9     indicated that she was in the United States, but I don't know

10    if they actually gave the specific address.  I couldn't find

11    that page again --

12         THE COURT:  And I can't find the Post-It.  I think

13    the Post-It fell -- oh here it is.  Okay.  So the one that we

14    found -- that Alexa found, is page 235 of something.

15    Paragraph 12, but I guess I would have to show it to the

16    government because you'll have trouble finding it.  It's --

17    since it isn't Bates stamped, it's hard to --

18         MR. REILLY:  And, Your Honor, I apologize for that.

19    I can correct that.  I won't put Ms. Whalen out.  I will

20    provide the Court and Ms. Whalen with a Bates stamped copy --

21         THE COURT:  Okay.

22         MR. REILLY:  -- as well.

23         THE COURT:  If it helps though --

24         MR. REILLY:  I apologize for the hardship --

25         THE COURT:  In fact, I'm just going to make a copy

1  of this page just so we'll have them here, just while we're

2  doing this, so -- and if you could give me a copy of your

3  page -- just give me your page, I'll copy it and then we'll

4  all have the same pages without having to worry about where

5  we are.

6       (Court and clerk confer.)

7       THE COURT:  Anyway so -- so there two -- then there

8  two instances in the extradition petition that seem to

9  suggest that the Indian government was aware of where she was

10 living back in 2002?

11      MS. WHALEN:  Yes, Your Honor.

12      THE COURT:  Okay.

13      MR. REILLY:  So I think that while my client may

14 not have made the asylum claim until she was taken into

15 custody and about to be extradited or was about to be

16 returned on her visa overstay, I don't think that that's an

17 unusual circumstance that would show sort of any -- I guess

18 what -- ingenuousness in her asylum claim.

19      I then wanted to talk about the length and the

20 complexity of the extradition process because the government

21 cited -- I think it's *Rivero* where they say that a person by

22 appealing or taking advantage of all of the appeals and

23 lengthening an extradition request --

24      THE COURT:  Right.

25      MS. WHALEN:  -- yes, I think it's matter of

9

1    extradition of *Rivelli* -- doesn't have the right to claim

2    that there's been too much delay.  And, Your Honor, I would

3    note that one of the cases the government cited, *Castanada-*

4    *Castillo*, which is --

5              THE COURT:  I've got the cite.

6              MS. WHALEN:  Okay.  In *Castanada-Castillo*, they

7    found that to be a special circumstances.  It was also an

8    asylum request and in terms of --

9              THE COURT:  Right.

10             MS. WHALEN:  -- lengthy proceeding, they looked at

11   the amount of time that the Peruvian government had taken to

12   extradite.

13             THE COURT:  Right.

14             MS. WHALEN:  They noted the interplay of asylum

15   with the extradition proceeding and they didn't look with

16   disfavor upon someone who had legitimate appeals issues

17   raising those issues.

18             THE COURT:  Right.

19             MS. WHALEN:  So I think that the mere --

20             THE COURT:  Otherwise you shouldn't be penalized

21   for exercising your constitutional --

22             MS. WHALEN:  Right.

23             THE COURT:  -- and statutory rights.

24             MS. WHALEN:  Especially when the matter is not

25   frivolous and I think here when we're arguing the convention

1    against torture, it's not frivolous.  Your --

2                   THE COURT:  Excuse me just second.

3                   Alexa, I've got the copies for the -- for counsel.

4

5                   MS. WHALEN:  Your Honor, and then I think the

6    government's final response to my argument about the

7    likelihood of bail.  The government's right.

8                   It's not the mere availability of bail for an

9    offense, it's availability for the individual who's about to

10   be extradited and that's where the affidavits that we

11   supplied the Court I think are relevant, especially with

12   respect to Rajeev Khanna, my client's brother.

13                  Rajeev Khanna is the one who's referred to as the

14   mastermind in the extradition proceedings.  Rajeev Khanna

15   also fled to the United States.  He later returned to India

16   and was released on a bond.

17                  So I think if the mastermind who fled and returned

18   was released on bond, I think that if Ms. Kapoor returned to

19   the United States -- returned to India, then she would be

20   able to seek bond.

21                  And just to clarify if -- if I misspoke at the

22   initial detention hearing, my position isn't that my client

23   fled because she knew she was the target of an investigation.

24   My client fled because she'd been tortured --

25                  THE COURT:  I understand.

1          MS. WHALEN:  -- in an interrogation.

2          THE COURT:  Excuse me.

3          MS. WHALEN:  And then just one interesting thing

4    with respect to the rejection of care for another individual

5    as a basis for bond.  In the *Lo Duca*, Mr. Lo Duca was

6    released on a bond pending the extradition hearing to be able

7    to care for his wife.

8          It was only after he'd been ordered extradited and

9    had brought a habeas petition for continued bail pending his

10   appeals of the extradition that release was denied, but

11   initially that was considered sufficient.

12         I understand that most courts when they're deciding

13   special circumstances only look at the health of the

14   individual involved, but I think that the Court can still

15   consider my client's care of another individual to be part of

16   the general confluence of special circumstances that would

17   permit release in this case.

18         THE COURT:  Would I be the first one to do that, or

19   not?

20         MS. WHALEN:  No, it was done --

21         THE COURT:  Because of that one case?

22         MS. WHALEN:  It was -- yes, my reading of *Lo Duca*

23   was the *Lo Duca* decision that is cited was -- and I can get a

24   copy of it.  I think that's the Westlaw decision.  That was

25   Judge Trager's determination of the habeas.  And in that --

12

1   believe it was Magistrate Pollak.  I'll have to check the

2   case, but I believe that that was in this jurisdiction.

3   Mr. --

4            THE COURT:  Right, I've got the Westlaw cite for

5   it.

6            MS. WHALEN:  Yes, he'd been released during the

7   extradition process to care for his wife who had serious

8   Alzheimer's.  In the end, the magistrate judge found that he

9   should be extradited.  He then appealed to Judge Trager and

10  at that point that was when Judge Trager said this is no

11  longer a special circumstance.

12           I'm not arguing that it should rise to the level of

13  a special circumstance, but I believe that the Court is

14  allowed to consider it in the confluence of circumstances

15  existing that would justify bail.

16           THE COURT:  So Judge Trager never really ruled on

17  it in the context of a proceeding that hadn't been decided?

18           MS. WHALEN:  No, no, he was ruling in the context

19  of the extradition having --

20           THE COURT:  Right.

21           MS. WHALEN:  -- already been ordered.

22           THE COURT:  Got it.  Okay.  And it was Judge Pollak

23  or whoever the magistrate was --

24           MS. WHALEN:  That ordered a release.

25           THE COURT:  -- magistrate judge was who ordered the

13

1    release?

2             MS. WHALEN:  Yes, I can -- I've got it with me

3    somewhere in here if I can find --

4             THE COURT:  And that wasn't appealed?  And there's

5    no decision on appeal?  Or was that -- or was there no time

6    in between the --

7             MS. WHALEN:  I don't believe it was appealed.

8             MR. REILLY:  I don't believe there's any record of

9    an appeal, Your Honor.

10            THE COURT:  Okay.  All right, so that is the -- so

11   that's the only case then that we know of or that is a case

12   that we know of?

13            MS. WHALEN:  That's a case in this jurisdiction,

14   Your Honor.

15            THE COURT:  Right.

16            MS. WHALEN:  I think the other cases that I've seen

17   have said that it's not a special circumstance in and of

18   itself.  I think *Lo Duca's* the only case where before the

19   extradition proceeding they found it to be a special

20   circumstance.  But Judge Trager did in his decision

21   specifically say it's no longer a special circumstance.

22            THE COURT:  Right.

23            MS. WHALEN:  Or it's not a special circumstance.

24            THE COURT:  Any update on the date of the asylum

25   hearing or is it still in September, September 30th?

14

1            THE DEFENDANT:  Still September 30th.

2            THE COURT:  Okay.

3            MR. REILLY:  And, Your Honor, may I both address

4     that but also provide the Court some information with respect

5     to the asylum hearing?

6            THE COURT:  Sure, and before you do that.

7            MR. REILLY:  Yes.

8            THE COURT:  The numbers that I was referring to,

9     they appear to be the -- someone has paginated at least my

10    set --

11           MS. WHALEN:  I think somebody handwrote maybe at

12    the bottom, but it's not clear --

13           THE COURT:  It's not clear what it is.

14           MR. REILLY:  Yes, it was provided in that context

15    which is why I filed it as such, but I understand that the

16    pagination is -- upon close review is not --

17           THE COURT:  It's not --

18           MR. REILLY:  -- particularly consistent, so --

19           THE COURT:  Right.

20           MR. REILLY:  -- I think it may make things easier

21    going forward --

22           THE COURT:  Yes.

23           MR. REILLY:  -- to provide a Bates stamped copy --

24           THE COURT:  But to the --

25           MR. REILLY:  -- which I'm happy to do so.

1          THE COURT:  -- to the extent there is a number on

2   the pages that the Court has copied and that you've

3   discussed --

4          MR. REILLY:  Yes.

5          THE COURT:  -- I just want to say for the record

6   that those numbers are 235 and 10.

7          MR. REILLY:  Yes.

8          THE COURT:  All right, just --

9          MR. REILLY:  Thank you, Your Honor.

10          THE COURT:  -- just so the record is clear.

11   Whether that's an accurate pagination or not, that's what

12   these pages say.

13          MR. REILLY:  Yes, Your Honor.

14          THE COURT:  Okay.  Go ahead.

15          MR. REILLY:  So first let me just address, since

16   Your Honor raised it, the question of the asylum hearing,

17   which I've been in communication with the Office of

18   International Affairs for the Department of Justice who

19   informed me that is, is their course in this instance they

20   had -- they've informed Department of Homeland Security of

21   this proceeding and that a stay has been requested in the

22   asylum proceeding.

23          At this point my understanding is that they're

24   unaware -- they've informed the, excuse me, the immigration

25   judge of that, but have not been given a hearing date so they

1    don't know whether there will be a stay prior to that hearing

2    date or if the judge will hold the hearing date as previously

3    anticipated.

4                THE COURT:  What would the basis of the stay be

5    that --

6                MR. REILLY:  My understanding is, again from my

7    conversations with the folks at the Office of International

8    Affair who do this regularly, that there's -- they frequently

9    make this request or as a matter of course make this request

10    so that there aren't sort of contradictory rulings coming out

11    of the court in the course of the extradition proceeding and

12    the asylum claim.

13                THE COURT:  Although they're two different

14    decisions though, aren't they?

15                MR. REILLY:  Yes, as -- understood, Your Honor.

16    But I -- again, and I can --

17                THE COURT:  Okay.

18                MR. REILLY:  -- get additional information.  My

19    understanding is that that -- this sort of as a matter of

20    course they have the extradition hearing take its -- sort of

21    take precedent and request for a stay in the asylum

22    proceeding.

23                THE COURT:  So the extradition hearing -- well, if

24    the --

25                MR. REILLY:  The extradition proceedings, I should

17

1      say.

2                THE COURT:  Right.  So the extradition proceedings

3      would probably go before the asylum proceedings, at least if

4      that's -- that's Homeland Security's request?

5                MR. REILLY:  Yes.  Or I -- and the way I

6      understand --

7                THE COURT:  Rather than staying these proceedings

8      for the asylum.

9                MR. REILLY:  No, exactly, the way I understand it

10     -- or has worked in the past is that the Department of

11     Justice indicates to the Department of Homeland Security that

12     there are extradition proceedings ongoing and in coordination

13     with the Department of Homeland Security, DHS then makes a

14     request to the asylum judge that those proceedings be stayed

15     pending the extradition proceeding is -- now, whether or not

16     that is always followed by the asylum judge, I -- the

17     immigration judge, I'm uncertain, but --

18               THE COURT:  And then --

19               MR. REILLY:  -- but that request is made.

20               THE COURT:  And if a decision were made on the

21     extradition proceedings, would the extradition -- assuming,

22     and I have no reason to say one way or another what the

23     result would be in this case, but if the order were to

24     extradite in a given case, would that be stayed pending the

25     asylum proceedings or would the asylum proceedings simply

1    just not take place because the extradition hearing --

2            MR. REILLY:  I will find out the answer to that,

3    Your Honor.  I'm not certain.  I know that Ms. Whalen

4    indicated in her papers that -- and there's case law for the

5    support -- in support of the filing of a habeas petition in

6    that instance so as to, you know, have the asylum process

7    take its course.

8            I will find out though and certainly inform the

9    Court as to whether or not as a matter of course the

10   extradition order, if there were to be such an order, would

11   be stayed and pending the completion of the asylum

12   proceeding.

13           THE COURT:  Is the opposite ever true?  Do parties

14   ever request a stay of the extradition proceedings pending an

15   asylum proceeding or does that not ever happen?

16           MR. REILLY:  Again, I -- my understanding is, is

17   that -- I'm happy to find out the answer.  I don't know.  I

18   have been informed by the Office of International Affairs

19   that this -- their standard practice is to have the

20   extradition proceeding go ahead of the asylum, but I

21   certainly wouldn't want to represent to the Court that that's

22   the way it always happens.

23           THE COURT:  No, I'm -- I just heard you say that

24   they didn't want to have contradictory rulings and I wasn't

25   sure how that ultimately was going to play out.

                                                                    19

1           MR. REILLY:  Right, that's my understanding of the

2    rationale is to have the extradition proceeding go first.

3           THE COURT:  Okay.

4           MR. REILLY:  So --

5           THE COURT:  All right.  So would you wish to be

6    heard on the --

7           MR. REILLY:  Yes, Your Honor.

8           THE COURT:  -- the bail issue?

9           MR. REILLY:  Taking them one by one, and I

10   certainly agree with Ms. Whalen that the -- as this is an

11   area that's developed in federal common law, it is an area in

12   which there is a wealth of potentially or often actually

13   contradictory guidance.

14          But I think that it is clear on a few points.  One

15   is that the standard is quite high for extradition -- for

16   bail in an extradition proceeding because it isn't simply a

17   matter of things that we consider as a result of the bail

18   act, flight risk and risk of danger to the community, but

19   also because there are treaty obligations involved and the

20   desire to fulfill those obligations.

21          With respect to the issue of the potential for

22   success on the merits or high potential success on the

23   merits, again, the government certainly acknowledges that Ms.

24   Whalen or -- and Ms. Kapoor have identified issues that will

25   be raised undoubtedly in an -- in a hearing, but the

1   submission of an affidavit -- and I understand that Ms.

2   Whalen said it may not be unusual, but nonetheless, 10 years

3   after the fact of the claim of asylum or in -- I should say

4   as part of her asylum claim recanting the statement that was

5   made in 1999 is -- in and of itself, while it may create an

6   issue of fact, isn't high probability of success on the

7   merits.  There is contrary evidence, the evidence that's

8   included -- the statement that Ms. Kapoor signed, as well as

9   the documentary evidence that's contained herein.

10          So to -- while I understand that it creates an

11  issue, I think to say that it -- that there's been creation

12  of a high standard of or high probability of success is just

13  not an accurate reading of the fact.

14          And I think that's why the cases that the

15  government cited which indicated that at this stage it's

16  premature to make a determination as to probability success

17  on the merits are apt in this case.

18          With respect -- moving on to the issue of the

19  length and complexity the extradition hearing, I think it's

20  important to look at the fact that the process has been

21  moving -- setting aside the question of the 2003 arrest

22  warrant, it's not as if there's been delay here from the

23  presentation of the arrest warrant or the bail hearing and

24  the fact that we're here today.

25          I think that there are instances in which the

1      courts have found delay in which there has been, for

2      instance, a request for additional evidence from the

3      requesting country and that evidence has been not forthcoming

4      for a matter of months or years during the course of the

5      proceeding itself.

6              I agree that we would be in a very different

7      position if Your Honor asked for an extradition hearing a

8      month from now and the government came back and said I need,

9      you know, a year and a half to get material -- additional

10     material from the Indian government, but that's not the

11     situation here.

12             And I think it is a scenario in which -- while the

13     government is in no way suggesting that Ms. Kapoor not be

14     permitted to exercise all of her rights, the notion that --

15     that expressing the intent to sort of fight every step of the

16     process should then be kind of bootstrapped into an argument

17     that the process is going to be unusually lengthy and delayed

18     is -- I think sort of runs the risk of having the -- this

19     particular exception swallow the rule.

20             And I think the same is true with respect to the

21     notion of the applicability of bail in the requesting

22     country.  You know, I think that as an initial matter,

23     there's obviously multiple courts throughout the country in

24     various districts that have rejected the (indiscernible)

25     position and I should note that although the *Duca* case

22

1    considers this as -- or mentions it, I should say, as a

2    special circumstance, the availability of bail in the

3    requesting -- the request -- in the requesting country, *Duca*

4    case doesn't address this at all.  It sort of is giving a

5    laundry list of potential special circumstances.

6              So once again we have, you know, the guidance

7    starting with *Wright* in the supreme court suggesting --

8              THE COURT:  So *Duca* can go either way then, right?

9    We don't know what Judge Trager would have decided --

10             MR. REILLY:  Exactly, it's identifying it and

11   saying this is out there --

12             THE COURT:  It's a factor --

13             MR. REILLY:  -- in the case law.  You know, there

14   are then six or seven courts throughout the country that have

15   said this is -- you know, this is a -- this is sort of a

16   special circumstance that we don't understand and that we

17   explicitly reject because of the fact that it would sort of

18   create -- stand the presumption on its head in the sense that

19   if there were a presumption of bail or a lenient bail

20   standard in requesting countries, it would often stand the

21   *Wright* presumption against bail in extradition proceedings on

22   its head.

23             So I think for each of those reasons, the -- as set

24   forth perhaps more eloquently I hope in the papers, the --

25   we think that these special circumstances don't apply in this

1    instance.

2              THE COURT:  Right.  You know, I think that the

3    circumstance that was not raised in the papers but that was

4    raised here at oral argument is probably the one that I'm the

5    most likely to consider first, which is the -- not the length

6    and complexity of the extradition hearing or the delay in the

7    completion of it but the lack of -- oh boy, I have to find a

8    diplomatic way to say this, but the lack of speed -- I'll

9    just say speed with which the Indian government has pursued

10   this -- the arrest after the issuance of the arrest warrant

11   in 2003 and which might be a gauge as to the urgency with

12   which the Indian government is seeking this defendant or at

13   least did over the years.

14             And there have been cases that at least chambers

15   have found that have talked about delays in following up

16   criminal proceedings in other countries, delays much shorter

17   than this.

18             There was a decision out of -- in California in the

19   Southern District of California in the *Tates* case and there

20   have been some other cases where one might consider that

21   delay as a factor.

22             So I suppose the way to say it is the sense of

23   urgency.  Where there isn't a heightened sense of urgency,

24   then the deference that the government gives to another

25   government or at least that this Court gives might be

24

1    tempered somewhat as opposed to a case where the government

2    has been diligently from the outset trying to find and

3    extradite a defendant.

4          And in this case, if in fact as documents number 10

5    and -- 235 to whatever it is -- and 235 indicate the Indian

6    government was aware of Ms. Kapoor's presence in this country

7    for a long time and didn't act upon it for seven or -- at

8    least seven years, that I believe is a factor that can be

9    deemed as special circumstance or at least contribute to one.

10         And I was wondering whether you had a view on that

11   or if that's something -- since it wasn't briefed, something

12   you feel you need a minute to think about.

13         MR. REILLY:  No, Your Honor, I guess I would say

14   that I think that -- and I sort -- I -- during the course of

15   my research came across the *Tates* case, among others, that

16   raised this issue.

17         I guess I would say that I -- it seems to me to be

18   potentially treacherous terrain for courts -- for U.S. courts

19   to sort of start delving into the criminal process of foreign

20   countries and obviously certainly seven years I will clearly

21   say is -- you know, is a considerable amount of time so I

22   don't want to make -- I don't want to suggest that it's not

23   worthy of consideration.

24         THE COURT:  You wouldn't wait seven years to

25   execute an arrest warrant here in this district, I'm sure.

25

1          MR. REILLY:  I don't think that my supervisor be

2    too happy about that, Your Honor.

3          THE COURT:  No.

4          MR. REILLY:  That said, you know, I think that the

5    extradition process and sort of I think that the idea of

6    going back for one moment to the issue of the availability of

7    bail I think is a potentially applicable argument in the

8    following context, Your Honor.

9          I think some of the courts that have rejected that

10   line of special circumstance have been hesitant because it

11   does put this Court in the position of having to make

12   determinations of what effectively are foreign law or

13   determinations about what -- you know, what would happen

14   under foreign law with a given defendant and a given set of

15   charges.

16         Now, again, I -- it would be foolhardy suggest that

17   this Court isn't capable of taking cognition of the fact that

18   it was seven years.  Obviously, I understand that.

19         But I think that the fact of the matter is, is that

20   for whatever reason, and I certainly endeavor to find out the

21   reason, an arrest warrant reissued in 2010 and that matter

22   has been -- in late in 2010 and that matter has been dealt

23   with quickly or relatively quickly by the standards of

24   international protocol.

25         So again, it is not suggest that 2003 to 2010 or

26

1    2011 is not a long delay, but that I think it's -- you know,

2    in terms of the high standard that exists for finding of --

3    for granting bail in an extradition case, that inserting

4    ourselves into the Indian government's criminal justice

5    process is sort of not ample reason to allow bail in this

6    instance.

7            THE COURT:  I'm wondering -- again, I think you

8    were accurate when you described the patchwork nature of the

9    decisions that there's not a huge consistency in the federal

10   common law, and you'll find some courts going one way and

11   some courts going other ways.

12           It seems to me that some of that has to do with the

13   special circumstances provision being both a high hurdle but

14   also one that's individualized to a particular case.

15           And it may be that in determining whether any one

16   of these factors alone can justify a special circumstance or

17   whether taken together with other factors they would justify

18   a special circumstance, the Court is going to have to make

19   that determination.

20           You know, and it seems to me that -- in looking at

21   the factors that Ms. Kapoor has brought to the Court, the

22   likelihood of success in -- ultimately on the merits,

23   especially in India, that's -- you know, that's something

24   that the Court is perhaps less likely to be able to have a

25   crystal ball to make a determination about.

1        But other circumstances which are -- which seem to

2   be more in the nature of the special circumstance, such as

3   the delay by the Indian government in following up on the

4   arrest warrant, the asylum application, the health

5   circumstances of a relative while perhaps not standing on its

6   own but perhaps in combination with other factors, and the

7   fact that one of the co-defendants in India was extradited to

8   India and then released on bail, that some of those factors

9   taken together might also be part of the individual

10  circumstances that the Court would consider in this case.

11       And the question that I would ask is whether or not

12  there's any case law that gives guidance as to how a court

13  should evaluate these claims.

14       In other words, does the Court have to find that

15  there's one special circumstance that by itself would be

16  sufficient to qualify as a special circumstance?

17       In other words, if I find delay is the strongest

18  reason, is it -- if that by itself doesn't constitute a

19  special circumstance, am I not permitted to look at other

20  factors or does the Court have to -- or is -- may the Court

21  or should the Court consider the totality of the

22  circumstances in determining whether special circumstances,

23  plural, exist.  And I don't recall --

24       (Court and clerk confer.)

25       MR. REILLY:  And, Your Honor, I would just add that

1       the decisions are perhaps uniform in this:  They all set

2       forth the high bar.

3              THE COURT:  Yes.

4              MR. REILLY:  None of them really -- none of them --

5       and I may be incorrect on *Tates*, but as a general rule I

6       should say perhaps more accurately that they're the sort of

7       talismanic formulation of totality of the circumstances is

8       not used in these cases.

9              THE COURT:  Right.

10             MR. REILLY:  That said, I certainly wouldn't want

11      to represent that -- you know, in many instances it looks as

12      if there are sort of a balancing test or that the fact --

13             THE COURT:  Seems that way.

14             MR. REILLY:  -- that it's sort of it's used if not

15      formulated in that context.  And I -- and the particular case

16      at the moment escapes me.

17             I do have some recollection of at least one case in

18      which there sort of was an inkling that perhaps the

19      (indiscernible) special circumstance out of three or four or

20      five was met and the court said well, that's sort of enough -

21      - that in and of itself is not enough given everything else.

22             So I think the long and -- or the short answer is

23      that I think there is sort of de facto perhaps measure of a

24      totality of the circumstances, although it's certainly not

25      formulated that way in the case law.

1          THE COURT:  Right.

2          MS. WHALEN:  My reading the only case where I found

3     there was one special circumstance were the cases below *Lo*

4     *Duca* in terms of the original release on bond and in the

5     underlying case the only circumstance noted was the health of

6     the relator's -- I think relator's wife.

7          THE COURT:  And that wasn't a written opinion, was

8     it?

9          MS. WHALEN:  I'm not sure that it was.  I don't

10    think it was.  I think it's set forth in the --

11         THE COURT:  Right.

12         MS. WHALEN:  -- history of *Lo Duca* --

13         THE COURT:  Right.

14         MS. WHALEN:  -- on how it was set forth, so I don't

15    know if that was in fact the only one or if that was the only

16    one Judge Trager chose to recognize as special.

17         My review of the cases I think is similar to the

18    government's where most of the decisions set forth these

19    five, six, seven, eight circumstances have been found

20    special, they go through they'll make a comment as to whether

21    this circumstance exists in this case.

22         The cases where it's denied, my recollection is

23    that it's always no special circumstances exist, like we've

24    looked at X, Y and Z and none of these special circumstances

25    exist.

```
1            So I think it is a de facto recognition of

2      totality.  I think for the most part they find more than one

3      special circumstance and as I said, Lo Duca was the only one

4      where it seemed that there had only been one special

5      circumstance.

6            THE COURT:  All right.  So we'll move on next to

7      likelihood or the risk of flight?

8            MS. WHALEN:  Well I think the prosecutor has noted

9      my client's flight from India to the United States as

10     demonstrating a risk of flight and the fact that she would

11     remove her children and her family and bring them here

12     because of this investigation makes her a risk of flight.

13            I think at this point it weighs on the opposite

14     side.  I think she fled because she was about to be tortured.

15     She's here.  She's filed an asylum claim.  Her ability to

16     remain in the United States rests on this asylum claim, as

17     does her family's.

18            So that if she fled, she not only would be hurting

19     herself, but she'd also be hurting their chances to remain in

20     the United States and at this point her children, who came

21     here when they were young, I believe are now 19 and 14 so

22     they --

23            THE DEFENDANT:  Sixteen.

24            MS. WHALEN:  Sixteen?

25            They've become acclimated to the United States.
```

1       They've lived here for the majority of their --

2                    THE COURT:  Right.

3                    MS. WHALEN:  -- lives at this point and I think

4       that the circumstances weigh against her flight.  I think she

5       has every reason to stay here.  No reason to leave.

6                    The Court could -- in terms of a guarantee that she

7       wouldn't flee, any documents that she has -- if her passport

8       hasn't been filed with the immigration authority as part of

9       the bond, she could post it with pretrial services.  She

10      could submit to electronic monitoring.  I think there are a

11      number of things that can be done to guarantee that she stays

12      here.

13                   I think flight would be to another country.  I

14      think it would be hard for her to be a fugitive within the

15      United States and I think that electronic monitoring and

16      confiscation of any travel documents would eliminate that

17      risk.

18                   THE COURT:  And could you just reiterate what the

19      bail package is?  I have it in writing, at least --

20                   MS. WHALEN:  Yes.  Your Honor, at this point the

21      bail package is much smaller than the one that I had

22      originally hoped to bring to the Court.

23                   THE COURT:  Okay.

24                   MS. WHALEN:  A number of the suretors have

25      citizenship applications pending and despite my reassurances

32

1    that this would have no bearing on it, they were reluctant to

2    go forward with those applications pending.  So at this

3    point, four suretors came in this morning to be interviewed

4    by pretrial services.  One was found not of a viable

5    financial surety, Mr. Renthara (ph).

6              And I can't find fault with pretrial's decision,

7    especially in light of, for the most part, this is going to

8    be a financial viability bond and they're finding that his

9    credit does not make him a worthy suretor in addition to the

10   prior criminal offense.

11             So we have Mr. and Mrs. Narula (phonetic) and

12   Saranjeet Sethi (ph).  Ms. Sethi is Ms. Kapoor's friend and

13   Mr. Narula -- Ms. Narula is her -- an aunt on her maternal

14   side and Mr. Narula is her husband.  Ms. Narula has known my

15   client all of her life and Mr. Narula has known her for the

16   past 25 years.

17             The three individuals are all residing legally in

18   the United States.  They have -- Mr. Narula is completely

19   verified.  I think Ms. Narula just has to verify her

20   employment and Ms. Sethi just has to verify her income, but

21   they've both been found to be viable suretors in this case.

22             The amount of cash that we had hoped to post has

23   also diminished.  At this point it's only $2,000.  But I

24   think that given what Ms. Kapoor has to lose if she flees,

25   given what her family faces if she flees, and given her close

1     relationship to the individuals who are posting her bond and

2     who are signing a bond for her, I don't think she would put

3     them at risk.

4                 And I have explained to everyone that the bond will

5     be in -- greatly in excess of whatever financial security is

6     posted for the bond and so that simply losing the cash is not

7     what would happen in this case; that they would be on the

8     hook for many years for a large amount of money that would,

9     in effect, financially ruin them.

10                So I think they've all come to court understanding

11    that responsibility, understanding what those -- the

12    liabilities are, and they're still willing to sign this bond

13    knowing that it's an extradition to India and knowing that

14    the charges are pending in India and they're still willing to

15    sign a bond on her behalf.

16                THE COURT:  So the suretors that you mentioned, Ms.

17    Kethi (ph) and Mr. Narula?

18                MS. WHALEN:  And his wife, yes.  Saranjeet Sethi,

19    Nishu Narula, and Vijay Narula.

20                THE COURT:  Okay.  So there are three plus --

21                MS. WHALEN:  Ms. Kapoor would sign.  Her husband is

22    here and would be willing to sign.  I didn't know if the

23    Court would accept his signature because he's undocumented.

24    But in terms of moral suasion he will definitely sign the

25    bond.

34

```
1              MR. REILLY:  Your Honor, may I just inquire --

2              THE COURT:  Absolutely.

3              MR. REILLY:  -- or raise one issue -- and before I

4    forget, pretrial services informs me that Ms. Kapoor's Indian

5    passport is not -- I guess not currently in her possession

6    but in a safe deposit box at a bank.

7              MS. WHALEN:  And we could make it available to the

8    Court before she was released.  That would be a condition

9    that it be surrendered before she's released.

10             MR. REILLY:  But the other issue I wanted to raise

11   with Your Honor was that my understanding is that there is a

12   bond posted in connection with the asylum proceeding as well

13   and I was -- wanted to know whether any of the suretors here

14   are also suretors on that bond.

15             THE COURT:  Think it was a cash bond, wasn't it?

16             MR. REILLY:  Was it --

17             THE DEFENDANT:  It was --

18             MS. WHALEN:  I'm sorry, just --

19        (Counsel and defendant confer.)

20             THE COURT:  It was 25,000 cash, right?

21             THE DEFENDANT:  Yes.

22             MR. REILLY:  Okay.

23             MS. WHALEN:  I think twenty-two five hundred.

24             THE COURT:  Twenty-two five?

25             THE DEFENDANT:  Yes.  Already posted.  Full cash
```

1    bond.

2              MS. WHALEN:  And actually, Your Honor, my client's

3    family brought the passport with them today.

4              THE COURT:  Oh, they got it from the safe

5    deposit --

6              MS. WHALEN:  Or they got it after I think they left

7    pretrial.

8              THE COURT:  Okay.  Any objection to just depositing

9    that with pretrial services now pending --

10             MS. WHALEN:  No, not at all.

11             FEMALE VOICE:  Oh, I have it.  I'll bring it up.

12   Okay, perfect.  Thank you.

13             MR. REILLY:  Your Honor, with respect to risk of

14   flight, you know, I think I'll just briefly reiterate what's

15   in the papers which is that while I understand that there are

16   family members and community ties here at the moment or that

17   have built over the past 10 years, that obviously this is a

18   particularly grave circumstance that Ms. Kapoor is facing and

19   countered with a similar circumstance in the past, she

20   obviously uprooted her life.

21             So I just, you know, I raise the issue that I

22   certainly don't suggest that it would be easy to relocate,

23   but I think that this is obviously a serious situation.

24             THE COURT:  Right, but again with everything at

25   stake with the asylum application, it seems that she has

1    everything to lose and nothing to gain by fleeing at least

2    before the asylum application.

3              Also if her brother -- I don't know at the time

4    that she left India if she had any idea that her brother

5    would be released on bail, so it sounds as though even if she

6    went -- if she were extradited back to India, there is a good

7    likelihood that she'd be released on bail.  Again, there's no

8    way to predict individual circumstances.

9              MR. REILLY:  Correct, Your Honor.  I mean, I -- the

10   one piece I -- which I think I raised was simply I don't know

11   how her absence would -- and her leaving the country would

12   impact on the bail proceeding, but understood the situation

13   that her brother --

14             THE COURT:  Was similar.  And how do we know that

15   the brother was the mastermind?

16             MS. WHALEN:  They said it in all those affidavits.

17             THE COURT:  So we'll just --

18             MS. WHALEN:  I have no idea that he's the

19   mastermind, but all of the affidavits, the conclusory

20   allegation is that he, Rajeev, is indeed the mastermind.

21             I think they probably make that conclusion because

22   Rajeev apparently hid a number -- I think Rajeev hid the

23   incriminating documents showing that the invoices and the

24   licenses had been altered with a friend of his and that's

25   where they were located.

1    THE COURT:  At least we don't have any information

2    to contradict the allegation that he was the mastermind?

3        MS. WHALEN:  No, and that's the government's -- the

4    Indian government's conclusion or the Indian police

5    department's conclusion is that he was the mastermind.

6        THE COURT:  Okay.  How long do we anticipate that

7    the extradition proceedings would last?  Let me just ask the

8    government that first.

9        MR. REILLY:  I think it's not a particularly

10   knowable sort of length at the moment, Your Honor, and I can,

11   again, find out sort of through conversations with the Office

12   of International Affairs what the standard length of such a

13   proceeding.

14       I know that there is one in our office right now

15   which has lasted about -- is sort of coming to an end after

16   about a year which reflected I think multiple appeals and

17   sort of habeas petitions, et cetera.

18       So one I think sort of not unlike at least what Ms.

19   Whalen made representation to her in her papers where sort of

20   every step of the way was contested and that was the time

21   frame that at least again anecdotally was what occurred

22   recently --

23       THE COURT:  So would that be a fair assumption in

24   this case or at least no reason to believe that that's not --

25       MR. REILLY:  I have no reason to believe otherwise

1    given the representations --

2              THE COURT:  Okay.

3              MR. REILLY:  -- made by counsel.

4              THE COURT:  Ms. Whalen?

5              MS. WHALEN:  Your Honor, I mean I think we're

6    probably ready to go on the hearing before you.  I mean I

7    would just like some time to prepare because the documents

8    are voluminous --

9              THE COURT:  Right.

10             MS. WHALEN:  -- and I think there's going to be a

11   lot of reference back and forth.  I don't know if the

12   government's going to be calling any witnesses to testify,

13   but just on the face of the documents itself, I think it's

14   probably going to be a day's hearing because we're going to

15   go -- be going back and forth between the documents and what

16   we show and what we don't show.  But I think in terms of -- I

17   think we've got the diplomatic note that's needed to go to

18   the next step.

19             THE COURT:  And then would there be some briefing

20   afterwards, do you think, or --

21             MS. WHALEN:  I mean I think there probably would.

22             THE COURT:  -- not necessary?

23             MS. WHALEN:  I doubt the government's going to

24   concede that it's a dead bang lack of probable cause and I

25   don't even know if they could.  I think that they're required

1    to appeal --

2              MR. REILLY:  I think that's a fair assumption.

3              MS. WHALEN:  -- on the part of the Indian

4    government.

5              MR. REILLY:  That is a fair assumption, Your Honor.

6              MS. WHALEN:  So I think -- you know, we'd probably

7    need additional briefing, but I think probable cause would be

8    easy to brief.

9              I think urgency, the -- those -- the other issues,

10   there's urgency, there's the substantive evidence issue,

11   there's the evidence that we can -- I think it's going to be

12   -- yes, it is going to be I would think probably at least

13   three weeks for each brief just because of the number of

14   issues that you have to touch on.  So that would put us into,

15   let's say, three months.

16             And then in terms of the appeal, the habeas appeal,

17   it's probably the same arguments that we would make to you,

18   so I don't know that there would need to be any additional

19   briefing unless the Court made findings that we didn't feel

20   had been covered in the initial briefing so that the habeas

21   briefing should be relatively quick assuming you ordered

22   extradition, assuming that we appealed, which I believe we

23   would.

24             And then I -- I'm not -- in terms of the appeal

25   after that, I think the habeas -- I'm just -- I -- whether we

40

1      have -- I think we have the right under -- on the habeas

2      appeal to go up to the Second Circuit.

3                THE COURT:  Circuit, yes.

4                MS. WHALEN:  And then when that came back, she

5      would also have the additional right to appeal to the state

6      department on the convention against torture.

7                I think that the extradition merits would probably

8      be relatively -- would probably be resolved here within six

9      months, but I don't know what the time frame -- I know the

10     Second Circuit is backed up, so I don't know how long they

11     take to resolve these matters, but I assume it goes on a fast

12     track since it's extradition.

13               Then I haven't been able to tell from the cases how

14     long it would take to get the state department ruling on the

15     convention against torture.  Then there's -- she has the

16     right to appeal their finding if they find against her and

17     then ultimately it looks, although it hasn't been -- I don't

18     think it's been litigated in this circuit yet.  It looks like

19     she then has the right to have her asylum proceeding

20     reinstated and get a ruling on the asylum proceeding.

21               THE COURT:  Assuming that it's stayed.

22               MS. WHALEN:  Assuming that it's stayed, yes.

23               MR. REILLY:  Assuming that it's stayed and -- yes,

24     and I believe that that is an open issue.

25               MS. WHALEN:  Yes.

41

```
1            THE COURT:  Probably would make more sense just to
2      go ahead with the asylum proceeding because that would --
3      could answer a lot of questions that need to be answered.
4      But it's not -- anyway.  It's not this Court's decision.
5            MS. WHALEN:  So --
6            THE COURT:  Okay.
7            MS. WHALEN:  -- probably a year if not more.  I
8      think that's probably conservative --
9            THE COURT:  Okay.  Anything else?
10           MS. WHALEN:  No, Your Honor.
11           MR. REILLY:  No, Your Honor.
12           THE COURT:  All right, so I'm going to reserve
13     decision, but let me just say that I think -- are the
14     suretors here today?
15           MS. WHALEN:  Yes, they are.
16           THE COURT:  Okay, so I think what we should do is
17     draft a hypothetical bond.  I do this in all cases so that
18     the suretors, especially those from Maryland, don't have to
19     come back.  And then we would draft it and I'll issue a
20     ruling.  I have to say that I am -- does anybody need to
21     submit anything supplemental?  It sounds as though you said
22     everything you needed to say here today, but let me know if
23     there -- you do.
24           MR. REILLY:  I don't believe so, Your Honor, but
25     I'll take a look and obviously communicate with chambers if
```

1     need -- but I don't believe so.

2            THE COURT:  Okay.  I have to say that the -- I've

3     identified for you, you know, the issues that I see and this

4     -- my real concern about the length of time it took to

5     execute that warrant in addition to the other circumstances.

6     But again, I haven't reached a final decision.

7            Okay.  Could you ask the suretors to come forward?

8        (Pause.)

9            MS. WHALEN:  And then do you want Ms. Kapoor's

10    husband to sign as well?  Although he can return at any time

11    if the Court's willing to --

12           THE COURT:  Yes, why don't we let him do it.

13           MS. WHALEN:  Okay.  Sign today?

14           THE COURT:  Yes.

15       (Pause.)

16           UNIDENTIFIED MALE:  Yes, please.

17       (Pause.)

18           THE COURT:  All right.  Now, pretrial services has

19    mentioned a number of conditions here.  Have -- again, I'm

20    not making a ruling as to whether or not you can be released

21    today, but if the release were granted, what would a

22    hypothetical bond look like?  Would it include these

23    conditions?  Would it look different from this?  Do you want

24    me to suggest the conditions?

25       (Counsel confer.)

```
1            THE COURT:  We have the home detention with

2    location monitoring.  Is that GPS now or is that -- what is

3    it?

4            MR. LEHR:  Your Honor, we generally like to choose

5    the type of technology just based on location and so forth,

6    but --

7            THE COURT:  Okay.

8            MR. LEHR:  -- traditionally it would just -- the

9    radio frequency would detect whether she was -- when she

10   comes and goes.

11           GPS would be -- basically track more, but I don't

12   know how many units we have available and so forth.  That's

13   where we generally like to ask the Court if it's okay for us

14   to choose the technology.

15           THE COURT:  Does the government have a preference

16   either way?

17           MR. REILLY:  I would defer to pretrial, Your Honor.

18           THE COURT:  Okay.

19           MS. WHALEN:  Your Honor, we can meet all of these

20   conditions, the home detention, reporting to pretrial, the

21   travel restricted to New York City, random home visits by

22   pretrial, and she's already surrendered the passport, so all

23   of these conditions are fine with the defense.

24           THE COURT:  What about the government?

25           MR. REILLY:  Yes, Your Honor.
```

44

1          THE COURT:  Okay.  So would you like to just fill

2     those conditions in on the bond?

3          MS. WHALEN:  Sure.

4          THE COURT:  In the meantime, Alexa, would you mind

5     swearing in the suretors?

6          THE CLERK:  Sure.

7        (The suretors are sworn.)

8          THE COURT:  All right.  Good afternoon.  Can you

9     each just say your name for the record, please, starting with

10    you, ma'am?

11         MS. SETHI:  Saranjeet Sethi.  Saranjeet Sethi.

12         THE COURT:  Thank you.

13         MR. NARULA:  Vijay Narula.

14         MS. NARULA:  Nishu Narula.

15         MR. KAPOOR:  Atul (ph) Kapoor.

16         THE COURT:  All right, you can all stand up a

17    little closer, if you like.  All right.  Do you understand

18    what it means to sign a bond?

19         MALE VOICE:  Yes.

20         FEMALE VOICE:  Yes.

21         THE COURT:  All right, now we haven't come up with

22    a bond amount.  You want to speak to Ms. Whalen and ask --

23         MR. REILLY:  Yes.

24        (Counsel confer.)

25         MS. WHALEN:  Your Honor, I believe it'll be

1      $100,000.

2              THE COURT:  Does the government agrees if the bond

3      were issued, that that would be the appropriate amount?

4              MR. REILLY:  Yes.  Yes -- reserving our position,

5      Your Honor, yes.

6              THE COURT:  Yes, of course.

7              MR. REILLY:  Yes.

8              THE COURT:  You're not consenting to the bond.

9              MR. REILLY:  Yes.

10             THE COURT:  Okay.  All right, so this would be a

11     100,000-dollar bond.  You do not have to put any money down.

12     You don't have to pay anything.  But if Ms. Kapoor were to

13     violate the conditions of her release -- in other words, if

14     she left her home without permission or if she didn't appear

15     in court when she was supposed to, you would each be liable

16     for up to $100,000.

17             The government could choose to take it all from any

18     one of you or divide it up any way it wishes.  In other

19     words, each one -- the government can only take $100,000, but

20     it could take $100,000 from, you know, Mr. Kapoor or it could

21     take $5 from you and the rest from the others.  Do you

22     understand?

23         (No audible response.)

24             THE COURT:  So the suretors have indicated they

25     understand.

```
1              The government can take this money by either taking

2      any property that you have -- if you have an automobile, it

3      could take your automobile, it could take any savings that

4      you have, and it could take part of your wages each paycheck;

5      could garnish your wages.  Do you each understand that?

6              MALE VOICE:  Yes.

7              THE COURT:  All right, you need to all speak up.

8              ALL:  Yes.

9              THE COURT:  Okay.  Is there anybody who has any

10     questions about anything that I've said?

11             MALE VOICE:  No.

12             THE COURT:  All right.  Would you all be signing

13     this bond because you want to?

14             FEMALE VOICE:  Yes.

15             MALE VOICE:  Yes.

16             THE COURT:  All right.  Anybody force you or

17     threaten you to make you sign the bond?

18             FEMALE VOICE:  No.

19             THE COURT:  All right.  And let me just ask how

20     does each one of you know Ms. Kapoor.  Ma'am?

21             MS. SETHI:  I know her from nine years like -- I

22     know her from nine years.  She's a family friend.  We are

23     very close friends, actually.

24             THE COURT:  Okay.  Sir?

25             MR. NARULA:  Well I'm related to her and I know
```

```
 1    her --
 2                THE COURT:  Can you just say your name for the
 3    record?
 4                MR. NARULA:  Yes, I'm -- I know her since she was a
 5    child and she's grown before me and I know her for the last
 6    25, 26 years.
 7                THE COURT:  Okay.  Ma'am, can you just say your
 8    name for the record, please?
 9                MS. NARULA:  My name is Nishu.
10                THE COURT:  Yes.
11                MS. NARULA:  She's my niece.
12                THE COURT:  Okay.
13                MS. NARULA:  She was born in front of me and I know
14    her (indiscernible) --
15                THE COURT:  Thank you.  Sir?
16                MR. KAPOOR:  She's my wife.
17                THE COURT:  I understand.
18                MR. KAPOOR:  I know for 40 years.
19                THE COURT:  Okay.  Thank you.  All right, so you're
20    all free to sign the bond.
21                Have both attorneys looked at the bond to make sure
22    that it -- it's satisfactory?
23                MR. REILLY:  Yes, Your Honor.
24                THE COURT:  Okay.
25                All right, Ms. Kapoor, I'm not making the decision
```

1   today, but I've listened to the arguments that your attorney

2   has made and that the government's attorney has made and the

3   law -- I have to follow the law, whatever the law tells me to

4   do.

5          There is some -- there are some questions that I

6   need to do some research about to answer, but I will try to

7   make the decision as soon as I can.  Okay.

8          MR. LEHR:  Your Honor?

9          THE COURT:  Yes?

10          MR. LEHR:  With regard to the passport, if Ms.

11   Kapoor does not make bond, should this be returned to her

12   husband or should it be held in pretrial?

13          THE COURT:  How do you want to do that?

14          MS. WHALEN:  Why don't we return it to her husband

15   and he can put it back in the safe deposit box.

16          THE COURT:  Okay.  Thank you.

17      (Counsel and clerk confer.)

18          THE COURT:  We'll do it just a minute, yes.

19      (Pause.)

20          THE COURT:  All right.  For the record, I'm

21   assuming that neither counsel will be making any additional

22   submissions, but if there is anything you do want to submit,

23   just do it by the end of the day tomorrow, okay, so I can

24   make a decision.  And I just want everyone to know that I'm

25   taking this very seriously and that I will try to make a

1    decision as soon as I can.  Okay?  Same for the government.

2              MS. WHALEN:  Oh, Your Honor, do you want to set a

3    hearing date for the extradition hearing today or should

4    we  --

5              THE COURT:  Yes.  How much time do you need to

6    prepare for it and do you want to submit anything in writing

7    beforehand?  Would that make more sense, or after the

8    hearing?

9              MS. WHALEN:  It might make more sense to do it in

10   writing unless you're going to call -- do you anticipate in

11   calling witnesses right now?

12             MR. REILLY:  At the moment, Your Honor, I don't

13   anticipate calling witnesses, although that may be subject to

14   change.  I don't know.  Obviously I will find an answer to

15   that rapidly.

16             MS. WHALEN:  Sure.

17             THE COURT:  Sure.

18             MR. REILLY:  But I was anticipating perhaps

19   submitting something in writing, sort of briefing in advance

20   for Your Honor.

21             THE COURT:  I think that makes sense.

22             MS. WHALEN:  Yes.  I think you have all the paper.

23   So --

24             THE COURT:  Yes.

25             MS. WHALEN:  -- as I said, I have already a

1    paginate copy that I'm happy to send to everybody and so we

2    could, if we worked off of that copy, I think -- I just --

3    I'll be away at the conference next week so I would say 6th,

4    13th, maybe the week after the 13th?

5              THE COURT:  The 20th?

6              MS. WHALEN:  Yes.  If I could have it the week of

7    the 20th?  I -- why don't I make it Monday, and that'll

8    keep --

9              THE COURT:  The 16th?

10             MS. WHALEN:  Is that the --

11             THE COURT:  Or the 20th?  Well, the 13th is a --

12             MS. WHALEN:  A -- it's a Monday, right?

13             THE COURT:  -- Monday.  Okay.

14             MS. WHALEN:  I don't have my calendar.

15             MR. REILLY:  The 13th is a -- Monday, June 13th.

16             MS. WHALEN:  Yes.  So we'll --

17             THE COURT:  Okay, so tell me what day you would

18   like it?

19             MS. WHALEN:  Why don't we put it on for me, for my

20   personal record keeping, I'll be more on top of it if it's

21   due on a Monday, the 20th.

22             THE COURT:  June 20th, okay, so that's the hearing

23   submissions.  Okay.

24             MS. WHALEN:  All right.  I -- I'm sorry, and I --

25   is that okay with you?

```
 1              MR. REILLY:  Yes, that's fine.

 2              MR. REILLY:  Okay.

 3              THE COURT:  And, Mr. Reilly, what -- excuse me,

 4    what -- when would you like to respond?

 5              MR. REILLY:  Your Honor, if I could have -- let me

 6    just double check.  If the Court would be willing to give me

 7    until the middle -- the -- 10 days, to the 29th?

 8              THE COURT:  Of course.

 9              MR. REILLY:  Okay.  In fact, if I may, Your Honor,

10    maybe to be more safe, just the Friday, the 1st of July?

11              THE COURT:  Of course.  All right.  And then what

12    do you -- what would you like to do after that?  Do you want

13    a decision made on papers?  Do you want to come in for an

14    oral argument?  Do you want an actual hearing in which there

15    would be witnesses?  You probably don't know the answer to

16    that yet, right?

17              MS. WHALEN:  Yes, maybe we could -- maybe we -- I

18    could -- I could talk to Mr. Reilly after I see his

19    submission and we could talk about whether we need a hearing,

20    which I -- I'm not sure that we will.

21              You guys can all go sit down, I'm sorry.

22              MR. REILLY:  Uh-huh.

23              THE COURT:  Oh, yes, please.  Please sit down.  And

24    you also -- I mean I would like to have argument on it.  I

25    think it would be good for --
```

1               MS. WHALEN:  Yes.

2               MR. REILLY:  Yes, Your Honor.

3               MS. WHALEN:  Yes.

4               THE COURT:  -- for all purposes, because I may have

5      some questions.

6               MR. REILLY:  Sure.

7               MS. WHALEN:  So we could maybe put argument on two

8      weeks after the 1st or one week?

9               THE COURT:  Probably depends on how long it's going

10     to take us to review.  How voluminous are your submissions

11     going to be?

12              MS. WHALEN:  I have no idea at this point.

13              MR. REILLY:  Yes.

14              MS. WHALEN:  I mean I know that going through it I

15     saw a lot of factual things that I wanted to bring to the

16     Court's attention.  It's not going to be as big as --

17              THE COURT:  All right.  Let me just --

18              MS. WHALEN:  Maybe we could contact the Court the

19     Monday, like how -- maybe Tuesday the -- well, I'm sorry,

20     I'll be away.  Maybe we could contact the Court on the 11th

21     and -- of July.  We could have a status conference or maybe

22     do a conference call to the Court to see what seems to be the

23     best next step.

24              THE COURT:  Okay.  I have a trial that starts the

25     following week and it could be lasting through the middle of

53

1    the week of the 25th, so it's always good if we can schedule

2    a date just that we can hold just in case.

3                    MS. WHALEN:  Okay.

4                    THE COURT:  So perhaps the week of the 25th is a

5    good week to hold it then, correct?

6                    MS. WHALEN:  Your Honor, I think -- I'll be on

7    trial that week, although it should be relatively short if --

8    it's just a felony possession trial, so I would think I would

9    be available the 28th.

10                   THE COURT:  All right.  Otherwise we could do it

11   the 15th.  I just don't know if that's going to be enough

12   time.

13                   MS. WHALEN:  The 15th of --

14                   MR. REILLY:  July 28th, me.

15                   MS. WHALEN:  The --

16                   THE COURT:  Of July?

17                   MS. WHALEN:  The 28th?

18                   MR. REILLY:  Yes, I think the 28th may be

19   preferable, Your Honor.

20                   THE COURT:  28th is better?

21                   MR. REILLY:  Just --

22                   THE COURT:  Given --

23                   MR. REILLY:  -- given that --

24                   THE COURT:  Yes.

25                   MR. REILLY:  -- particularly if either side is

54

```
1       intending to call witnesses.

2               THE COURT:  Okay.

3               MR. REILLY:  Or --

4               THE COURT:  All right.  So the 28th, I have -- I

5       think we better do that in the afternoon.

6               MR. REILLY:  Okay.

7               THE COURT:  3:30?  Is that going to be enough time?

8       Well, you'll let me know if we need more time.

9               MR. REILLY:  Yes, Your Honor.

10              MS. WHALEN:  Yes, I --

11              THE COURT:  Do we need a conference on the 11th

12      just to see where we're going?

13              MS. WHALEN:  I think that's probably wise.

14              THE COURT:  Okay.  So I'm going to hold the 28th at

15      3:30.  The 11th, just to see what we need, we'll have a very

16      quick conference at 4:45?

17              MS. WHALEN:  12:45?

18              THE COURT:  4:45.

19              MS. WHALEN:  4:45 is good.

20              THE COURT:  Is that okay?

21              MR. REILLY:  That's fine, Your Honor.

22              THE COURT:  Okay.  And if you want to come in

23      person, come in person.  Otherwise, we can do it by phone.

24      Although you're here, but --

25              MS. WHALEN:  Yes.
```

55

1          THE COURT:  All right.  We'll do it in person then.

2          MS. WHALEN:  Okay.

3          MR. REILLY:  That's fine.

4          THE COURT:  All right.  Thank you.

5          MS. WHALEN:  Thank you.

6          MR. REILLY:  Thank you, Your Honor.

7          THE DEFENDANT:  Thank you.

8      (Proceedings concluded at 4:48 p.m.)

9      I, CHRISTINE FIORE, Certified Electronic Court Reporter

10   and Transcriber and court-approved transcriber, certify that

11   the foregoing is a correct transcript from the official

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14

15

16   _____          May 30, 2011

17      Christine Fiore, CERT

18

19

20

21

22

23

24